## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**ROBERT HAROLD MORRISON,**

      **Plaintiff,**

**v.**                                  **Case No.: 3:11-cv-0210**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

      **Defendant.**

### MEMORANDUM OPINION

This is an action seeking review of a partially favorable decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") regarding plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 10 and 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 11 and 12).

The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Robert Harold Morrison (hereinafter referred to as "Claimant"), filed for DIB benefits on January 30, 2008, and for SSI benefits on May 27, 2009, alleging

disability as of January 1, 2001 due to multiple sclerosis, adult attention deficit disorder, high blood pressure, depression, and pain. (Tr. at 159–71). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 86–90, 93–95). On September 3, 2008, Claimant filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 96–97). The administrative hearing was held on August 10, 2009 before the Honorable Marc Mates, ALJ. (Tr. at 44–82). On November 9, 2009, a supplemental hearing was held to consider additional medical source opinions. (Tr. at 28–43).

By decision dated December 22, 2009, the ALJ determined that Claimant was not disabled prior to April 9, 2008 but became disabled on that date. (Tr. at 6–27). The ALJ found that Claimant's last insured date was June 30, 2001. Consequently, the ALJ found that Claimant was eligible for SSI benefits but not DIB benefits. The ALJ's decision became the final decision of the Commissioner on January 28, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). On March 31, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on June 2, 2011. (Docket Nos. 7 and 8). The parties filed their briefs in support of judgment on the pleadings. (Docket Nos. 10 and 13). Therefore, this matter is ripe for resolution.

## II.   Claimant's Background

Claimant was 42 years old at the time of his alleged onset of disability. (Tr. at 159). Claimant had an 11th grade education and was able to communicate in English. (Tr. at 192). He previously worked as a laborer (Tr. at 186–87) and owned and operated a heating and air conditioning business. (Tr. at 50).

### III.   Relevant Medical Records

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

### A.   Historical Treatment Records—1976 through 1999

From 1973 to 1996, Claimant worked in a warehouse as a manual laborer. As early as 1981, Claimant reported to his primary care physician, Dr. Donald Klinestiver, that he had pain in his lower back radiating down into his lower extremities. (Tr. at 264). In 1983, Claimant's left eye was injured at work and a foreign metallic object had to be removed. (Tr. at 264). A similar incident occurred in 1985, injuring Claimant's right eye, which required him to wear an eye patch for a period of time. Claimant continued to receive treatments for his eyes through 1992.  (Tr. at 261-62).

In October 1994, Claimant advised Dr. Klinestiver that he wanted "to go back on" antidepressants. Accordingly, Dr. Klinestiver wrote prescriptions for Paxil and Elavil.[1] (Tr. at 260). On October 31, 1994, Claimant was examined by Panos Ignatiadis, MD, with complaints of pain in his dorsal and lumbar spine, which radiated down into his legs. (Tr. at 245–46). Dr. Ignatiadis reviewed a MRI of Claimant's spine and found no evidence of disc herniation. Dr. Ignatiadis concluded that Claimant's back pain was likely a result of the cumulative effects of Claimant's job. Claimant was not found to be a surgical candidate, so Dr. Ignatiadis recommended a work hardening program. On March 14, 1995, a CT scan of Claimant's lumbar spine revealed no spinal stenosis and minimal bulging of the L5-S1 disk with no other significant abnormalities. (Tr. at 488).

---

[1] Claimant continued to receive pharmaceutical treatment for depression throughout the 90's and oo's.

In 1998, Claimant again experienced difficulty with his eyes, reporting that he felt pressure behind his eyes and that he was seeing black spots. (Tr. at 259). In 1999, Claimant began to experience problems with his gastrointestinal system that caused rectal bleeding. (Tr. at 258–59, 266–67, 273–74, 276–77, 282). In September 1999, Dr. David Ratliff performed an upper gastrointestinal endoscopy and a colonoscopy on Claimant. A surgical pathology report indicated that Claimant was suffering from moderate active chronic gastritis. (Tr. at 273–74).

B.      Treatment Records—January 1, 2000 through June 30, 2001

During the year prior to Claimant's alleged onset of disability, the medical records document three office visits with Dr. Klinestiver.  (Tr. at 258).  Two of the visits were for the purpose of receiving medication refills, and one visit involved treatment for a sore throat and sinus drainage. (*Id.*). During the six months between Claimant's alleged onset of disability and his date last insured, he had one additional office visit. On May 21, 2001, Claimant presented to Dr. Klinestiver's office with complaints of fractured ribs, contusions to the left leg and left hand, and cervical strain. He reported that five days earlier a 1000 pound electrical box had fallen on him. Dr. Klinestiver gave Claimant some Vioxx samples. (*Id.*). Other than a prescription for 90 Motrin 600 mg. tablets written on July 17, 2001, Claimant apparently received no further treatment for accident-related injuries.  (*Id.*).

C.      Treatment Records—Post Date Last Insured

On March 17, 2003, Claimant consulted with Robert Dundervill, MD, for evaluation of decreased vision and increasing blurriness in his left eye. (Tr. at 233–35). Dr. Dundervill diagnosed Claimant with a branch retinal vein occlusion in his left eye probably secondary to hypertension. Dr. Dundervill recommended that Claimant seek

treatment from his primary care physician for blood pressure control and consider returning for laser treatment or an intravitreal steroid injection if the retinal edema persisted. (Tr. at 234). On March 24, 2003, Claimant consulted with a family practice specialist, Leigh Ann Levine, D.O., regarding his hypertension. (Tr. at 451). Dr. Levine ordered routine blood work, a thyroid profile, and an EKG. At a follow-up visit in May, Dr. Levine diagnosed Claimant with a bowel disorder and hypertension for which she prescribed various medications. (Tr. at 448). Also in May 2003, Claimant's left eye was treated with an intravitreal steroid injection. (Tr. at 236–37). Claimant was seen by Dr. Dundervill again on July 11, 2003 and reported that the steroid injections did improve his vision. However, Claimant continued to experience some difficulties with his eyes. Accordingly, Dr. Levine ordered a CT scan of Claimant's brain in September 2003. (Tr. at 482). The scan showed subtle prominence of the cortical vessels in the right parietal region. A follow-up MRI of the brain revealed evidence of small vessel ischemic disease versus a demyelinating process.[2] (Tr. at 291)

On November 7, 2003, Claimant was examined by Dr. Ignatiadis for complaints of shoulder pain and left arm clumsiness and weakness. (Tr. at 244). Dr. Ignatiadis noted that Claimant was self-employed and ran a heating and cooling business. In addition to pain and weakness in his extremity, Claimant reported a history of retinal hemorrhage and an MRI result suggestive of small vessel ischemic disease. On examination, Dr. Ignatiadis found that Claimant had some mild impingement of his left shoulder and degenerative changes likely the result of making repetitive motions with his left upper extremity. Dr. Ignatiadis found no other focal neurological deficits. He

---

[2] Demyelization is a degenerative process, which erodes the myelin sheath that normally protects nerve fibers. Demyelization is seen in a number of diseases, particularly multiple sclerosis. ©1996-2012 MedicineNet, Inc.

reviewed Claimant's MRI film and commented that he saw some minute vascular lesions, but the film overall was not impressive. He suggested that if Claimant's complaints persisted, the MRI should be repeated, "just in case we are dealing with the tip of the iceberg of a condition in three months." (*Id.*). The MRI was repeated in May 2004 and again showed evidence of small vessel ischemic disease versus a demyelinating process. (Tr. at 241).  Dr. Ignatiadis wrote Dr. Levine to advise her of the MRI results, indicating that two punctuate lesions were seen that had not been present previously. (Tr. at 243). Dr. Ignatiadis felt that Claimant should continue to control his blood pressure and weight and commented that "[t]he whole thing is really unfortunate for a young man to go through luckily enough without any major disability at this conjuncture but the aim is really to prevent him from getting into trouble in the future so I will appraise you again as to the outcome of the tests." (*Id.*). Follow-up MRI studies performed on July 22, 2004 and October 24, 2005 demonstrated that the small vessel ischemic changes were stable. (Tr. at 293, 295). In addition, an MRI of Claimant's left lower extremity, as well as a duplex scan of the carotids, arterial doppler study, and arterial scan of the left lower extremity were inconclusive for stenosis or artery disease. (Tr. at 294, 476-80).

On September 12, 2007, a MRI of Claimant's cervical spine was performed at Tri-State MRI by Rodger Blake, MD. (Tr. at 296–97). The MRI revealed a small focal area of abnormal signal located in the midline posteriorly. Dr. Blake concluded that multiple sclerosis (MS) and myelitis should be considered. A follow-up MRI performed on September 20, 2007 revealed no abnormal enhancement suggestive of an acute process like acute myelitis. (Tr. at 298). Claimant was referred to and subsequently seen by Richard Rudick, MD, at the Cleveland Clinic on October 18, 2007. (Tr. at 308–13).

Claimant complained of muscle weakness, pain in his hands, difficulty concentrating, hypersomnolence, and fatigue that had worsened throughout the summer. Claimant's wife stated that she believed the symptoms had started more than two years earlier when he began experiencing problems with his shoulder. Dr. Rudick concluded that MS was a possible cause of Claimant's symptoms, but stated that the brain MRI was non-specific and that Claimant would need further testing.

Claimant returned to the Cleveland Clinic on November 16, 2007. Doksu Moon, MD, reviewed a follow-up MRI of Claimant's cervical spine. (Tr. at 323–26). Dr. Moon noted small central protrusions at C3-C4 and C4-C5 and a small lesion at the level of C2. Also on November 16, 2007, Catherine Bamford, MD, completed a lumbar puncture procedure. (Tr. at 317–18). Based on the results of the procedure, Dr. Bamford definitively diagnosed Claimant with MS. While at the Cleveland Clinic, Claimant's eyes were also examined. (Tr. at 341). Claimant reported experiencing blurred vision in his left eye due to a "film over [his] eye." On December 20, 2007, Claimant returned to the Cleveland Clinic for an appointment with Dr. Rudick. (Tr. at 343–48). In light of Claimant's MS diagnosis, Dr. Rudick recommended MS education and treatment, beginning with a trial on intravenous steroids followed by doses of oral prednisone.  (Tr. at 347).

On January 10, 2008, Claimant was evaluated by Cabell Huntington Hospital Home Health Care for intravenous solumedrol infusion therapy. (Tr. at 364–79). His rehabilitation potential and level of functioning were noted to be good.  On February 14, 2008, Claimant returned to the Cleveland Clinic for MS education and to assess his response to the intravenous steroid therapy. As part of the assessment, Claimant underwent a neuropsychological evaluation. (Tr. at 299–303). Richard Naugle, Ph.D.

found Claimant's neuropsychological profile to be largely unremarkable. He surmised that Claimant's mild visuomotor slowing and inefficient executive functioning might be connected to the changes seen on Claimant's brain MRI. Dr. Naugle also felt that Claimant had depressive symptomatology, which would be best evaluated by a psychiatrist. In the neurology clinic, Claire Hara Cleaver, CNP, conducted a review of Claimant's medical records. Nurse Cleaver noted that Claimant's MS symptoms likely began in 2005. She documented complaints of fatigue, spasticity, and a new onset of paresthesias. Nurse Cleaver prescribed Methotrexate and Neurontin and recommended a return visit in three months. (Tr. at 304-07).

On April 24, 2008, Dr. Levine drafted a letter recounting Claimant's treatment for MS and his diagnosis of cognitive dysfunction and a cervical lesion. (Tr. at 416). Dr. Levine stated that Claimant suffered from progressive, generalized weakness and fatigue and concluded that he qualified for disability. On November 11, 2008, Dr. Levine drafted another letter reiterating her belief that Claimant qualified for disability. (Tr. at 532).

### D.     Agency Assessments

On March 17, 2008, single decision maker, Greg Langford, completed a physical residual functional capacity assessment of Claimant. (Tr. at 392–99). Mr. Langford noted that there was no medical evidence of record (MER) in the file and concluded that there was insufficient evidence upon which the diagnosis of an impairment could be made for the period prior to Claimant's date of last insured.

On March 21, 2008, G. David Allen, Ph.D, completed a psychiatric review technique at the request of the Social Security Administration. (Tr. at 400–13). Dr. Allen stated that there was insufficient evidence from which he could evaluate Claimant's

mental impairments because there was no MER in the file. On August 20, 2008, Rabah Boukhemis, MD, was asked to complete a physical residual functional capacity assessment. (Tr. at 490–97). Dr. Boukhemis noted that there was no MER in the file and concluded that there was insufficient evidence upon which to make a diagnosis for the period prior to Claimant's date of last insured. On August 21, 2008, Rosemary Smith, Psy.D, was asked to complete a psychiatric review technique. (Tr. at 498–511). Dr. Smith concluded that there was no evidence on which to make a substantial diagnosis prior to Claimant's date of last insured.

### E.      Dr. Kuruvilla John

Following Claimant's initial administrative hearing on August 10, 2009, the ALJ requested Dr. Kuruvilla John's professional opinion of Claimant's ability to do work-related activities. (Tr. at 533). Dr. John completed his assessment on August 28, 2009 after reviewing Claimant's medical records. Dr. John first responded to five written questions posed by the SSA. (Tr. at 534–40). In his responses, Dr. John identified Claimant's physical impairments as including back pain, fatigue, and generalized weakness. He noted that in October 2007, Claimant had a physical examination at the Cleveland Clinic, which reflected a normal gait, normal balance, and an ability to hop on either foot. Claimant's memory was normal, but he complained of severe fatigue.  (Tr. at 534). Dr. John opined that none of Claimant's impairments met a listed impairment or were equivalent to a listed impairment when considered in combination.  (Tr. at 535). When asked if Dr. Levine's conclusion that Claimant was disabled was supported by objective medical findings, Dr. John stated, "He has no evidence of weakness as per Cleveland Clinic notes. Patient [complains of] fatigue. This is very difficult to quantify." (Tr. at 526). Dr. John was then instructed as follows: "If the claimant's physical

impairments did not cause such severe limitations during the period from January 1, 2001 to present, please complete the enclosed Form SSA-1151. This form shows in detail how and to what extent the claimant's impairments limited the ability to perform basic work-related functions during this period." Dr. John proceeded to complete Form SSA-1151, indicating that the maximum Claimant could lift and carry was 50 pounds. When asked the maximum Claimant could occasionally lift and carry, Dr. John wrote: "up to 1/3 of 8 hour day."[3] And when asked the maximum Claimant could lift frequently, Dr. John wrote "none."[4]  (Tr. at 537). Dr. John felt that Claimant had no impairment of his ability to stand, walk, or sit. He could frequently stoop, crouch, kneel, and crawl; could occasionally climb; and could never balance. Claimant's visual ability was somewhat limited, with a 20/80 visual acuity in his left eye, and he had environmental limitations involving heights, moving machinery, temperature extremes, and humidity.  (Tr. at 538-39). Dr. John added that "fatigue is a common problem with multiple sclerosis and this may limit total workday effort." (Tr. at 539).

## IV.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any

---

[3] "Occasionally" is defined as "from very little up to 1/3 of 8-hour day."

[4] "Frequently" is defined as "from 1/3  to 2/3 of an 8-hour day."

step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.

*McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through June 30, 2001. (Tr. at 13, Finding No. 1). The ALJ then determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since January 1, 2001. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairment of multiple sclerosis. (Tr. at 14, Finding No. 3). The ALJ considered Claimant's history of depression but found it to be non-severe. (Tr. at 14–15).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 15, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> [S]ince January 1, 2001, [C]laimant has the residual functional capacity to perform sedentary work . . . [C]laimant can lift up to 50 pounds one-third of an eight hour workday, but he can stand and/or walk no more than two hours total in an eight hour work day. He can sit eight hours total and can occasionally climb, but should not balance. He can frequently stoop, crouch, kneel, and crawl; has 20/80 vision in the left eye; and should avoid exposure to heights, moving machinery, temperature extremes, and humidity.

(*Id.*, Finding No. 5).

As a result, Claimant could not return to his past relevant employment. (Tr. at 18, Finding No. 6). The ALJ considered that prior to the established disability onset date, Claimant was a younger individual 45 to 49 years old. (*Id.*, Finding No. 7). The ALJ also considered that on April 9, 2008, Claimant's age category changed to an individual closely approaching advanced age. (*Id.*). Claimant had a limited education and could communicate in English. (*Id.*, Finding No. 8). The ALJ noted that transferability of job skills was not an issue because Claimant's past relevant work was unskilled. (*Id.*,

Finding No. 9). The ALJ then considered all of these factors and, relying upon the testimony of a vocational expert, determined that, prior to April 9, 2008, Claimant could perform jobs such as routing clerk, grader/sorter, and hand packer, all of which existed in significant numbers in the national and regional economy. (Tr. at 18–19, Finding No. 10). However, beginning on April 9, 2008, the date Claimant's age category changed, the ALJ found that there were no jobs that existed in the national economy that Claimant could perform. (Tr. at 20, Finding No. 11). On this basis, the ALJ concluded that Claimant was not under a disability prior to April 9, 2008, but became disabled on that date and continued to be disabled through the date of the ALJ's decision. (Tr. at 20, Finding No. 12).

## V.    Claimant's Challenges to the Commissioner's Decision

At issue in this case is the section of Dr. John's assessment addressing Claimant's ability to physically lift and carry objects as part of his work responsibilities. (Tr. at 537). At the supplemental hearing on November 9, 2009, the ALJ used Dr. John's findings as the basis for his hypothetical question to the vocational expert. (Tr. at 34–35). The ALJ interpreted Dr. John's findings to mean that Claimant could lift 50 pounds up to one-third of an eight hour workday, but could not frequently lift or carry 50 pounds. (*Id.*; Tr. at 18, 19). In contrast, Claimant's attorney interpreted Dr. John's findings to mean that Claimant could lift up to 50 pounds occasionally but could not lift *any* weight frequently. (Tr. at 36). These conflicting interpretations and the ALJ's failure to seek clarification of Dr. John's findings serve as the basis for Claimant's challenge. Claimant argues that the ALJ relied upon a faulty interpretation of Dr. John's assessment and, therefore, framed an improper hypothetical question to the vocational expert. According to Claimant, because the hypothetical question failed to accurately set out all of

- 13 -

Claimant's impairments, the opinions of the vocational expert were unreliable. (Pl.'s Br. at 9).  Claimant seeks a reversal of the ALJ's decision that Claimant was not disabled prior to April 9, 2008 or remand for clarification of Dr. John's opinions.

## VI.   Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

- 14 -

## VII.   <u>Analysis</u>

Having thoroughly considered the record, the Court finds that the Commissioner's decision is supported by substantial evidence for two reasons. First, Claimant received a fully favorable decision on his application for SSI. Hence, even assuming that Claimant is correct and the ALJ misunderstood Dr. John's opinion, Claimant could not have received any additional SSI benefits. Second, the record is devoid of any medical evidence to support a finding of disability prior to expiration of Claimant's insured status for DIB purposes. Thus, Dr. John's 2009 opinion of Claimant's ability to lift and carry was irrelevant to the validity of the ALJ's DIB determination. Accordingly, any error by the ALJ in framing his hypothetical question was harmless.

### A.    *SSI Benefits*

The Social Security regulations clearly state that an applicant for supplemental security income benefits may not receive such benefits for any period of time *prior to the month following the month of application*. 20 C.F.R. § 416.335. Therefore, SSI applications "are prospective in effect only and not retroactive." *Skeens v. Shalala*, 842 F.Supp. 209, 213 (W.D.Va. 1994). In the present case, Claimant alleged a disability onset date of January 1, 2001. However, Claimant did not file an application for SSI benefits until May 27, 2009.  In his decision, the ALJ correctly noted that "the established onset date [April 9, 2008] does not reduce the amount of Title XVI benefits the claimant may be able eligible to receive and this decision is fully favorable to the claimant with respect to his Title XVI claim." (Tr. at 12). Even if Claimant was found to be disabled prior to April 9, 2008, Claimant still would not have been entitled to SSI benefits prior to June 2009, the month following the month during which Claimant filed his application.

Inasmuch as a finding of disability prior to April 9, 2008 would have no affect on the amount of SSI benefits payable to Claimant, reversal or remand of this issue is pointless. Courts have applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D. Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983).[5]

### B.   DIB Application

To the extent that Claimant challenges the Commissioner's denial of DIB, the Court finds Claimant's argument to be without merit. In order to receive DIB, a claimant must: (1) be fully insured; (2) file an application; (3) meet the statutory definition for disability; and (4) have been disabled for five consecutive months. 20 C.F.R. § 404.315(a). Here, Claimant's alleged disability onset date was January 1, 2001 and Claimant's date last insured was June 30, 2001. (Tr. at 13). Consequently, to be entitled to DIB, Claimant was required to establish the existence of a disability during the six month period between January 1, 2001 and June 30, 2001.

During the eighteen months between January 1, 2000 through June 30, 2001, the evidence contains records for only four visits made by Claimant to a health care professional.  Only one of those visits occurred between the date of alleged onset of

---

[5] The Fourth Circuit has similarly applied the harmless error analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished).

disability and the expiration of Claimant's insured status for DIB. None of the office notes documenting these visits included a report of physical examination or a diagnosis. One visit record indicated that Claimant had a sore throat and sinus drainage; two other visits appeared to be for medication refill only; and the final visit documented a work-related accident suffered by Claimant for which he received scant treatment. (Tr. at 258). The record contains no objective medical findings relevant to the time period prior to June 30, 2001, which are indicative of any prolonged illness, impairment, or functional limitation.[6] Claimant was diagnosed with MS in November 2007, but nothing in the record suggests that he displayed any functional effects that could be related to that progressive disease before September 2003, when he complained to Dr. Ignatiadis about weakness and clumsiness in his left arm. (Tr. at 244). Despite this complaint, nearly a year after that visit and three years after his date last insured, Claimant's condition had not significantly deteriorated and did not appear to cause any substantial functional limitations. In June 2004, Dr. Ignatiadis confirmed that Claimant had no "major disability at this conjuncture." (Tr. at 243). Moreover, four state agency experts completed separate assessments of Claimant's alleged disability prior to date last insured and concluded that there was absent or insufficient medical evidence to substantiate a finding of disability. (Tr. at 392–99, 400–13, 490–97, 498–511). Indeed, the available evidence for the relevant time frame is inadequate to even establish the existence of a severe impairment given that medically acceptable clinical and diagnostic evidence of an anatomical, physiological, or psychological abnormality is necessary for such a finding. 20 C.F.R. § 404.1508. Consequently, regardless of how it is interpreted,

---

[6] Even if the Court were to consider fifteen years prior to Claimant's alleged onset of disability, the medical record demonstrates that Claimant received treatment for work injuries to his eye and mild degenerative changes to his spine and prescriptions for anti-depressants. Throughout much of this time, Claimant worked. Thus, nothing in the record supports a finding of disability prior to June 30, 2001.

Dr. John's 2009 assessment of Claimant's ability to lift and carry, which was expressly premised on Claimant's complaints of fatigue as documented in the 2007 Cleveland Clinic records, sheds no light on the issue of Claimant's condition prior to June 30, 2001. Claimant bears the burden of providing the Commissioner with evidence establishing his disability. 20 C.F.R. § 404.1512(a). Here, the record is so completely devoid of any such evidence that the alleged error by the ALJ could not conceivably have prejudiced Claimant on the merits of his DIB claim or deprived him of any substantial right. Therefore, the Court finds substantial evidence supports the Commissioner's denial of Claimant's DIB application.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  April 27, 2012.

Cheryl A. Eifert
United States Magistrate Judge

- 18 -